# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**ADELINE RENE' SINGLETON, ET AL.**

**VERSUS**

**EAST BATON PARISH SCHOOL
BOARD, ET AL.**

**CIVIL ACTION**

**NO. 22-489-JWD-EWD**

## RULING AND ORDER

This matter comes before the Court on *Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction* (Doc. 4) (the "*Motion*") filed by Plaintiffs, Adeline René Singleton, Christopher Kees, Sr., Tania Nyman, Dr. James C. Finney, Mary Anne "Boissiere" Lewis Leach, and Alvin Raetzsch (collectively, "Plaintiffs"). Plaintiffs have also submitted briefing in support of their motion. (Docs. 15, 18.)  Defendant East Baton Rouge Parish School Board (the "School Board" or the "Board") opposes the motion. (Docs. 7, 14, 19.) Defendants Doug Welborn, in his official capacity as the Clerk of Court for East Baton Rouge Parish (the "Clerk of Court" or the "Clerk"), and R. Kyle Ardoin, in his official capacity as Secretary of State of the State of Louisiana (the "Secretary of State" or the "Secretary") also oppose the motion. (Docs. 13, 17.)  An evidentiary hearing was scheduled for August 17, 2022, but that hearing is no longer necessary; the Court has thoroughly reviewed all evidence (including declarations) submitted in advance of the hearing.  The Court has also carefully considered the law, the record as a whole, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, the *Motion* is denied.

## I.     Relevant Factual and Procedural Background

### A.  Overview of Suit

Plaintiffs in this action are registered voters in East Baton Rouge Parish (the "Parish") and residents of the geographic portions of the Parish governed by the School Board. (*Pls.' Proposed Findings of Fact and Conclusions of Law (*"*Pls.' PFFCL*") ¶¶ II.A.1–7, Doc. 15; *Compl.* ¶¶ 4–5, Doc. 1.)[1]  Defendants in this action include the Board, the members of the Board in their individual and official capacities (the "Board Members"),[2] the Clerk of Court for the Parish, and the Secretary of State. (*Compl.* ¶ 7, Doc. 1.)

Plaintiffs allege that elections to the School Board to be held in the fall of 2022 will be conducted pursuant to an apportionment plan adopted by the School Board in 2014 (the "2014 Apportionment Plan"). (*Pls.' PFFCL* ¶ I.2, Doc. 15 (citing *Compl.* ¶¶ 40–41, Doc. 1).)  Plaintiffs claim that the use of the 2014 Apportionment Plan to conduct School Board elections in 2022 dilutes their votes in contravention of the "one person, one vote" guarantee of the Equal Protection Clause of the Fourteenth Amendment. (*Id.* ¶ I.3 (citing *Compl.* ¶¶ 44–46).)  Plaintiffs pray for an order enjoining the Secretary and Clerk from allowing any person to prepare a ballot for the November 8, 2022, School Board elections and from conducting those elections based on the 2014 Apportionment Plan pending an entry of a final judgment by this Court in this case. (*Id.* ¶ V.2.)

---

[1] Plaintiffs attach various declarations to their *Motion* that attest that all allegations contained in the *Complaint* are true. (*See* Single Decl. ¶ 3, Doc. 4-3; Kees Decl. ¶ 3, Doc. 4-4; Nyman Decl. ¶ 3, Doc. 4-5; Finney Decl. ¶ 3, Doc. 4-6; Leach Decl. ¶ 3, Doc. 4-7; Raetzsch Decl ¶ 3, Doc. 4-8.)  These declarations were also intended to be introduced as exhibits for the August 17, 2022, hearing. (*See* Pls. Ex. 1–6.)  All citations to the *Complaint* in this ruling implicitly include these verifying declarations.

[2] Specifically, the following Board Members were named in this suit: David Tatman, Dawn Chanet Collins, Mark Bellue, Dadrius Lanus, Tramelle Howard, Evelyn-Ware Jackson, Jill Dyason, Michael Gaudet, and Connie Bernard. (*Compl.* ¶ 7, Doc. 1.) Counsel for the Board indicated at a status conference that he thought he also represented the Board Members but that he was not certain.  Given the Court's ruling on Plaintiffs' *Motion*, the Board Members' appearance in the suit at this time (or lack thereof) is of no consequence.

### B.  Efforts to Reapportion

By way of background, in 2014, the School Board reapportioned itself into nine single-member election districts ("2014 Reapportionment Plan"). (*Compl.* ¶ 12, Doc. 1; *Pls.' PFFCL* ¶¶ III.A.4–5, Doc. 15.)   Following the 2020 Federal Decennial Census, the Board began the reapportionment process, (*Pls.' PFFCL* ¶¶ III.B.1–3, Doc. 15), even though the Board is not required to reapportion itself until the end of 2023, (*see* Decl. of Sherri Wharton Hadskey, Louisiana Commissioner of Elections, ¶ 22, SOS Ex. 3 (citing La. R.S. 17:71.5(A)).)[3]

Several reapportionment plans were submitted for consideration by the School Board. (*Pls.' PFFCL* ¶ III.B.3, Doc. 15.)  One of the plans submitted for consideration is known as the "Ware/Collins Plan 1-11," which provided for eleven School Board districts. (*Id.* ¶ III.B.4.) Another plan submitted for consideration is known as "Plan 22," which maintains a nine member School Board but changes the boundaries of the districts. (*Id.*) On May 5, 2022, the School Board adopted a resolution selecting Plan 22 as its reapportionment plan. (*Id.* ¶¶ III.B.12–13; Hadskey Decl. ¶ 24, SOS Ex. 3.)

### C.  The State Court Action

On May 16, 2022, four plaintiffs, all of whom are Plaintiffs in this lawsuit, filed suit in the Louisiana 19th Judicial District Court against the School Board, the Clerk, and the Secretary

---

[3] La. R.S. 17:71.5(A) provides in relevant part:

> A. By resolution adopted pursuant to R.S. 17:71.4, each school board shall reapportion itself based upon each federal decennial census, or a special census as authorized by R.S. 17:71.3(A). Such resolution shall be adopted on or before December thirty-first of the second year following the year in which the population of this state is reported to the president of the United States for each decennial census, unless an election of the members of the school board is to take place in the second year after reporting of the decennial census, in which case, the resolution is to be adopted no later than March first of the second year after reporting of the decennial census. . . .

seeking injunctive and declaratory relief. (*Pet. for Declaratory and Injunctive Relief* ("*State Ct. Pet.*"), Board Ex. 1 at 1.)  Specifically, these plaintiffs sought a declaratory judgment against the School Board that the Plan 22 reapportionment plan adopted by the Board was null and void, and that the Ware/Collins Plan 1-11 was the sole reapportionment plan that may be considered by the Board. (*Id.* at 9.)  The *State Court Petition* also sought to enjoin the School Board, the Clerk of Court and the Secretary from permitting any persons to qualify for an election, prepare any ballots, and/or conduct any election based on Plan 22. (*Id.* at 9–10.)

Following a hearing on June 13, 2022, the state trial court ruled on June 17, 2022, (a) that Plan 22 was "null and void"; (b) that the Secretary of State and Clerk of Court were "enjoined from using any ballots or any election information (including but not limited to maps, precincts, or election districts) that uses SB Public Plan 22 as a map of election districts for the upcoming November 8, 2022 election period"; and (c) that the Board must implement the Ware/Collins Plan 1-11 to be used in the School Board Election. (*Ruling and Order of the Court on Pet. for Declaratory and Injunctive Relief and Written Reason* ("*State Trial Ct. Ruling*"), Board Ex. 3 at 2, 6–7.)

On June 20, 2022, the Board appealed the trial court's ruling to the Louisiana First Circuit Court of Appeal. (Board Exs. 4–7.)  On June 24, 2022, the Board requested that the First Circuit stay the trial court's judgment pending the appeal. (Board Ex. 8.)

On June 30, 2022, the First Circuit granted the Board's request in part. (*State First Circuit Stay Order*, SOS Ex. 2.)  Specifically, the appellate court stated:

> We hereby deny the motion to stay to the extent it seeks to stay the preliminary injunction ruling issued by the district court in its June 17, 2022 ruling. However, we hereby stay the June 17, 2022 ruling in all other aspects pending further orders of this court, including the district court's order requiring the East Baton Rouge Parish School Board to "implement the nominated plan known as Ware/Collins 1-

11" and submit the nominated plan to the Louisiana Secretary of
State.

(*Id.*)  Oral argument took place at the First Circuit on August 10, 2022. (Board Ex. 13.)

In light of the trial court judgment enjoining the use of Plan 22 and the First Circuit's stay of the order to implement the Ware/Collins Plan 1-11, the November 8, 2022, School Board primary election is currently underway using the 2014 Reapportionment Plan. (Hadskey Decl. ¶¶ 29–30, SOS Ex. 3.)

In sum, the First Circuit is being asked by the Plaintiffs to order the School Board to implement the Ware/Collins Plan 1-11 (as the district court ordered), and the School Board is asking the Louisiana First Circuit to allow it to proceed with Plan 22, as it previously voted to do. Thus, if the First Circuit grants either side their requested relief, then Plaintiffs' suit on the 2014 Reapportionment Plan which is presently before this Court is moot.

### D.  Confusion Arising from Any Modification of the State Election Law

The School Board's primary election is November 8, 2022. (Hadskey Decl. ¶ 12, SOS Ex. 3.) This is the same day as the primary election for Congress. (*Id.* ¶¶ 12–16 (citing, *inter alia*, La. R.S. 17:402B(1)).)  Early voting starts October 25, 2022. (*Id.* ¶ 40.)  Absentee ballots must be mailed to the military and overseas voters by September 24, 2022. (Decl. of Stephen Raborn, Registrar of Voters, Parish of East Baton Rouge, ¶ 24, SOS Ex. 4 (citing La. R.S. 18:1308(A)(2)(a)); *see also* 52 U.S.C. 20302(a)(8)(A) (requiring absentee ballots be sent to absent uniformed service voters and overseas voters forty-five days before the election)).    Thus, the August 17, 2022, hearing before this Court was scheduled to take place:

- 2 months, 3 weeks, and 1 day (or 83 days) before the November 8 primary election;

- 2 months, 1 week, and 1 day (or 69 days) before the October 25 early voting commencement; and

- 1 month, and 1 week (or 38 days) before the Sept. 24 deadline for absentee ballots have to be mailed to military and overseas voters.

The Secretary and Clerk provide considerable evidence of the confusion, cost, and administrative burdens that will take place should the elections be delayed or canceled. These facts will be discussed in greater detail below.

## II.    Discussion

Having carefully considered the matter, the Court will deny Plaintiffs' *Motion* on two main grounds. First, the Court will abstain under the *Pullman* abstention doctrine from deciding the federal constitutional questions posed to this Court. Resolving the constitutional issues is unnecessary given the fact that the state court could decide a matter of unsettled state law (namely, which School Board plan to use) and thus obviate the need for this Court to decide the federal constitutional question. At the very least, the state court action could present the federal constitutional issue in a different posture, which justifies abstaining here.

Second, even if the Court did not abstain, it would deny the *Motion* under the *Purcell* principle. The Court is too close to the election to change the state's election law, and, further, Plaintiffs have not demonstrated that the changes could take place without significant confusion, cost, and hardship.

### A. *Pullman* abstention is warranted.

The Secretary of State and Clerk of Court urge the abstention doctrine of *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941). At the outset, the Court notes that, while Plaintiffs addressed *Younger* and *Colorado River* abstention in their *Proposed Findings of Fact and Conclusions of Law,* (*Pls.' PFFCL* ¶¶ IV.N–M, Doc. 15), they do not mention *Pullman* abstention in their *Reply*, (*see* Doc. 18). Thus, the Court could deem any opposition to these defendants' argument waived and deny Plaintiffs relief on this ground alone. *See Payton v. Town*

*of Maringouin*, No. 18-563, 2021 WL 2544416, at *26 (M.D. La. June 21, 2021) (deGravelles, J.) (collecting authorities on this issue), *aff'd*, No. 21-30440, 2022 WL 3097846 (5th Cir. Aug. 3, 2022). *See also Imani v. City of Baton Rouge*, No. 17-439, --- F. Supp. 3d ----, 2022 WL 2760799, at *13 (M.D. La. July 14, 2022) (deGravelles, J.) (denying motion in part because of failure to oppose (citations omitted)).

Nevertheless, the Court has considered the merits of the Secretary and Clerk of Court's argument and finds that abstention is appropriate. The Fifth Circuit summarized the law governing *Pullman* abstention as follows:

> In *Pullman,* plaintiffs challenged, on both federal constitutional and state law grounds, the authority of the Texas Railroad Commission to issue a racially discriminatory order. The Supreme Court abstained from deciding the case, because it found that if Texas courts were to strike down the Commission's action on state law grounds, it would be unnecessary to decide the federal constitutional question.
>
> As the Court later explained, the moral of *Pullman* was that "federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided. By abstaining in such cases, federal courts will avoid both unnecessary adjudication of federal questions and 'needless friction with state policies.' " *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984) (quoting *Pullman,* 312 U.S. at 500, 61 S. Ct. 643). "[F]or *Pullman* abstention to be appropriate . . . it must involve (1) a federal constitutional challenge to state action and (2) an unclear issue of state law that, if resolved, would make it unnecessary for us to rule on the federal constitutional question." *Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Committee,* 283 F.3d 650, 653 (5th Cir. 2002). In other words, "[g]enerally, *Pullman* abstention is appropriate only when there is an issue of uncertain state law that is fairly subject to an interpretation [by a state court] which will render unnecessary or substantially modify the federal constitutional question." *Baran v. Port of Beaumont Nav. Dist.,* 57 F.3d 436, 442 (5th Cir. 1995).

*Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009).

Here, the first prong of the analysis is easily satisfied. According to the operative complaint, "Plaintiffs seek an order declaring that the 2014 Reapportionment Plan of the School Board violates the 'one person, one vote' rule embedded in the Equal Protection Clause of the 14th Amendment." (*Compl.* ¶ 52, Doc. 1.)  Thus, this case involves a "federal constitutional challenge to state action." *Moore*, 591 F.3d at 745 (cleaned up).

The second factor is also satisfied, as there is "an unclear issue of state law that, if resolved, would make it unnecessary for [the Court] to rule on the federal constitutional question." *Id.* (cleaned up).  "The second factor is flexible—it is satisfied if the constitutional questions will be 'substantially modified,' or otherwise 'presented in a different posture.' " *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 n.13 (5th Cir. 2020) (cleaned up).

Thus, in *Texas Democratic Party*, the Fifth Circuit noted that "the district court's decision to forge ahead despite an intimately intertwined—and, at that time, unresolved—state-law issue was not well considered." *Id.*  The appellate court explained, "The plaintiffs raised federal constitutional challenges to Texas's vote-by-mail scheme, and the Texas Supreme Court's determination as to whether lack of immunity to the Virus equaled a 'disability' was bound to alter how the constitutional issues would be presented." *Id.*  The Fifth Circuit continued,

> If the plaintiffs had succeeded before the Texas Supreme Court, all Texas voters could have applied to vote by mail under the disability provision. Moreover, the plaintiffs' void-for-vagueness, voter-intimidation, and First Amendment claims all turn in substantial part on how the Texas Supreme Court was to interpret that disability provision. That much should have been obvious, given that the district court itself felt the need to interpret the disability provision.

*Id.* (cleaned up).  The Fifth Circuit found that "the district court's reasons for not abstaining [were]

suspect." *Id.[4]*

Judge Costa went even further in his concurrence:

> This was a textbook case for *Pullman* abstention. [*Pullman*, 312 U.S. 496.] The district court ruled just one day before the Supreme Court of Texas was hearing argument on a mandamus petition asking what counts as a "disability" under the mail-in ballot law. That forthcoming interpretation of state law could have made any federal constitutional ruling "unnecessary." *Id.* at 500, 61 S. Ct. 643.
>
> All the hallmarks for *Pullman* abstention were present. The definition of disability was an "unsettled question[ ] of state law." 17A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4242 (3d ed. 2020). The answer to that question could have obviated the need for a federal constitutional ruling. *Id.* There was "already pending a state court action that [was] likely to resolve the state questions without the delay of having to commence proceedings in state court." *Id.* That parallel state case had already reached the state's highest court, which could provide a definitive answer on the meaning of state law. *See id.* (noting that abstention is more appropriate when there is a direct route to obtaining an answer from the state's highest court rather than having to "litigate[ ] through the entire state hierarchy of courts"). And with the state court's expediting its case, there would still be time for the federal court to rule if it needed to after the state court decision. . . .
>
> A stay is thus warranted because the district court should have waited for the state supreme court ruling and should now evaluate the federal claims against that definite interpretation of state law. Maybe its result will be the same; maybe it won't. But this important issue should be resolved based on a full and accurate understanding of the relevant state law.

*Id.* at 417–19 (Costa, J., concurring).  Thus, in Judge Costa's "view, the case warranted abstention

because it involved:

---

[4] The Fifth Circuit also said that "[t]he district court's ruling turned [this circuit's] jurisprudence on its head" because the Fifth Circuit has "stated that traditional abstention principles apply to civil rights cases, including election-law cases involving important and potentially dispositive [sic] state-law issues." *Tex. Democratic Party*, 961 F.3d at 397 n.13 (cleaned up).

(1) an unsettled question of state law and the answer to the question from the state court could have obviated the need for a federal constitutional ruling; (2) an already a pending state court proceeding that had reached the Texas Supreme Court; and (3) time for the federal court to rule, if necessary, after the state court decision.

*Umphress v. Hall*, 500 F. Supp. 3d 553, 563–64 (N.D. Tex. 2020) (citing *Tex. Democratic Party*, 961 F.3d at 418).[5]

Here, the Court finds that the second *Pullman* requirement is easily satisfied. It cannot be said that resolution of the state court litigation—which will sort out which School Board plan will

---

[5] Judge Costa concurred in judgment because he thought the majority went too far and that *Texas Democratic Party* should have been decided solely on *Pullman* abstention grounds. Judge Costa's reasoning is worth quoting, as it strengthens this Court's decision in abstaining in the instant case:

> We should end this administrative stay decision with that threshold procedural error. But despite recognizing that the district court should have abstained, *see* Maj. Op. at 397–98 n.13, the majority goes on to address other procedural issues and the merits. In doing so, it makes the same mistake the district court did: reaching "unnecessary" constitutional questions. *Pullman*, 312 U.S. at 500, 61 S. Ct. 643.

> In addition to its perhaps more obvious interest in promoting "harmonious relation[s] between state and federal authority," *Pullman*, 312 U.S. at 501, 61 S. Ct. 643; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 75, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997), *Pullman* is an example of the broader principle that a federal court should address constitutional questions only when necessary. *Pullman*, 312 U.S. at 500, 61 S. Ct. 643; 17A WRIGHT & MILLER § 4242; *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345–56, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring). Because an interpretation of state law might eliminate or at least impact the constitutional issue, a federal court that does not wait for an imminent state court ruling risks publishing an advisory opinion.

> That same principle counsels against our delving into the merits of the case in this stay decision. "[I]f it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment). Because the failure to abstain alone supports a stay, merits discussion at this stage is unnecessary. It is also premature before the district court considers the claims in light of the now-determined issue of state law. The need for restraint is greater still at the stay stage as an opinion is not binding on the panel that will handle the appeal of the injunction. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). What is good for the district court should be good for the appellate court.

*Tex. Democratic Party*, 961 F.3d at 419 (Costa, J., concurring).

be used—will not "substantially modify" the instant action or, at the very least, present it in a different posture. The Court agrees with the Secretary and Clerk of Court:

> In this case, resolution of the state court litigation will "substantially modify" – if not eliminate entirely – the constitutional question now before the Court. The Louisiana 1st Circuit is being asked by the Plaintiffs to order the EBR School Board to implement the Ware/Collins Plan 1-11 (as the district court ordered). The EBR School Board is asking the Louisiana 1st Circuit to allow it to proceed with Plan 22, as it previously voted to do. If the Louisiana 1st Circuit grants **either side** their requested relief, then Plaintiffs' suit on the 2014 Reapportionment Plan is moot.

(*Secretary & Clerk's ("SOS & COC's") PFFCL* ¶ 84, Doc. 18.).

As to Judge Costa's second consideration, while this case has not reached the Louisiana Supreme Court yet, that alone does not preclude applying *Pullman* abstention. *See Umphress*, 500 F. Supp. 3d at 563–64 (finding *Pullman* would apply to an action by a state court judge even though the state court "lawsuit [was] still at the trial-court level" in part because "[s]hould the Texas district court decide the issues in . . . favor [of a similarly situated judge], it would render any federal constitutional decision by this [federal] Court unnecessary.").

As to the final Judge Costa factor, the Court is issuing these reasons on August 13, 2022. The state court appeal is being heard on an expedited basis, and the Court expects the Louisiana Supreme Court will do likewise with any appeal. Thus, any decisions by the state courts will likely still allow this Court to act.

In sum, the requirements for the *Pullman* abstention doctrine have easily been satisfied. Indeed, to use Judge Costa's language, "this is a textbook case for *Pullman* abstention." *Tex. Democratic Party*, 961 F.3d at 417. Consequently, this Court will refrain from deciding this case until the state court action runs its course.

### B. *Purcell* also warrants a denial of the *Motion*.

Might the Louisiana courts rule in such a way that neither side gets the relief requested? It seems unlikely but this Court will not speculate. Thus, assuming *arguendo* that *Pullman* abstention were not applicable, the Court would still refrain from issuing any injunctive relief in this case. In sum, the *Purcell* principle forecloses the Court from enjoining any state laws this close to the election, particularly when doing so would cause significant confusion, cost, and hardship.

### *1. Purcell Generally*

The Supreme "Court's election-law precedents . . . establish (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when, as here, lower federal courts contravene that principle." *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). Elaborating on these principles, Justice Kavanaugh wrote (which this Court will quote at length):

> Under our precedents, a party asking this Court for a stay of a lower court's judgment pending appeal or certiorari ordinarily must show (i) a reasonable probability that this Court would eventually grant review and a fair prospect that the Court would reverse, and (ii) that the applicant would likely suffer irreparable harm absent the stay. *Hollingsworth v. Perry*, 558 U.S. 183, 190, 130 S. Ct. 705, 175 L. Ed. 2d 657 (2010) (*per curiam*). In deciding whether to grant a stay pending appeal or certiorari, the Court also considers the equities (including the likely harm to both parties) and the public interest. *Ibid.*
>
> As the Court has often indicated, however, that traditional test for a stay does not apply (at least not in the same way) in election cases when a lower court has issued an injunction of a state's election law in the period close to an election. See *Purcell*, 549 U.S. 1, 127 S. Ct. 5, 166 L. Ed. 2d 1. This Court has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election, and this Court in turn has often stayed lower federal court injunctions that contravened that principle. See *ibid.*; see also *Merrill v. People First of Ala.*, 592 U.S. ——,

141 S. Ct. 25, 208 L. Ed. 2d 244 (2020); *Andino v. Middleton*, 592 U.S. ——, 141 S. Ct. 9, 208 L. Ed. 2d 7 (2020); *Merrill v. People First of Ala.*, 591 U.S. ——, 141 S. Ct. 190, 207 L. Ed. 2d 1113 (2020); *Clarno v. People Not Politicians*, 591 U.S. ——, 141 S. Ct. 206, 207 L. Ed. 2d 1154 (2020); *Little v. Reclaim Idaho*, 591 U.S. – ——, 140 S. Ct. 2616, 207 L. Ed. 2d 1141 (2020); *Republican National Committee v. Democratic National Committee*, 589 U.S. – ——, 140 S. Ct. 1205, 206 L. Ed. 2d 452 (2020) (*per curiam*); *Democratic National Committee v. Wisconsin State Legislature*, 592 U.S. ——, 141 S. Ct. 28, 208 L. Ed. 2d 247 (2020) (declining to vacate stay).

That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

Some of this Court's opinions, including *Purcell* itself, could be read to imply that the principle is absolute and that a district court may *never* enjoin a State's election laws in the period close to an election. As I see it, however, the *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures. Although the Court has not yet had occasion to fully spell out all of its contours, I would think that the *Purcell* principle thus might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship. Cf. *Lucas v. Townsend*, 486 U.S. 1301, 108 S. Ct. 1763, 100 L. Ed. 2d 589 (1988) (Kennedy, J., in chambers); *McCarthy v. Briscoe*, 429 U.S. 1317, 97 S. Ct. 10, 50 L. Ed. 2d 49 (1976) (Powell, J., in chambers).

*Merrill*, 142 S. Ct. at 880–81.

Looking at Justice Kavanaugh's framework, the Court finds that it should not interfere with the School Board elections.  First, Plaintiffs seek relief too close to the election.  Second, though this fact can be overcome, Plaintiffs cannot do so here because Plaintiffs have not shown that the changes in question are feasible "before the election without significant cost, confusion, or hardship."

### *2. Timing of the Election*

As to the first issue, the Court finds that Plaintiffs' challenge comes too close to the election.  "Time and time again over the past several years, the Supreme Court has stayed lower court orders that change election rules on the eve of an election." *Tex. All. for Retired Ams. v. Hughes*, 976 F.3d 564, 566–67 (5th Cir. 2020) (citing, *inter alia*, *North Carolina v. League of Women Voters of N.C.*, 574 U.S. 927 (2014) (staying a lower court order that changed election laws thirty-three days before the election); *Husted v. Ohio State Conference of N.A.A.C.P.*, 573 U.S. 988 (2014) (staying a lower court order that changed election laws sixty days before the election); *Purcell*, 549 U.S. 1 (staying a lower court order changing election laws twenty-nine days before the election)).  In *Merrill*, the Supreme Court stayed a preliminary injunction with the primary election "about four months" away and with the absentee primary voting "more than two months after the court issued its order." *See Merrill*, 142 S. Ct. at 888 (Kagan, J., dissenting).

The Fifth Circuit described *Merrill* as an "outlier," *Robinson v. Ardoin*, 37 F.4th 208, 229 (5th Cir. 2022), but the appellate court's assessment of *Merrill* in that case is questionable. *Robinson* made this statement in a ruling which upheld Judge Dick's refusal to grant a stay five months before the primary elections, *id.* at 228–31, but the Supreme Court ultimately reversed that decision and stayed enforcement of Judge Dick's injunction pending a decision by the Supreme Court in *Merrill, see Ardoin v. Robinson*, No. 21-1596, 2022 WL 2312680, at *1 (U.S. June 28,

2022). Further, while the Supreme Court did not explicitly say it granted the stay under *Purcell*,[6] the Supreme Court did state that it was holding the case "in abeyance pending this Court's decision in" *Merrill*, which was stayed under *Purcell*. *Id.*; *Merrill*, *supra*.  Thus, the Court finds that one reasonable albeit cautious reading of the Supreme Court's most recent action is that they found five months to be too close to the election.

But here the Court finds that somewhere between four months (*Merrill*) and two months (*Husted*) is within the *Purcell* doctrine.  *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) ("Whatever *Purcell*'s outer bounds, we think that this case fits within them" because "[w]hen the district court here issued its injunction, voting in the next statewide election was set to begin in *less* than four months (and local elections were ongoing" (citing *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir.) (per curiam) (noting that a stay was warranted in light of Purcell notwithstanding its observation that the election was "months away"), *motion to vacate stay denied*, No. 19A1054, 2020 WL 3456705 (June 25, 2020))).

This case falls within that range.  Again, the August 17, 2022, hearing was scheduled to take place: (a) 2 months, 3 weeks, and 1 day (or 83 days) before the November 8 primary election; (b) 2 months, 1 week, and 1 day (or 69 days) before the October 25 early voting commencement;

---

[6] The full text of the Supreme Court's order was as follows:

> Application for stay presented to Justice Alito and by him referred to the Court granted. The district court's June 6, 2022 preliminary injunctions in No. 3:22-CV-211 and No. 3:22-CV-214 is stayed. In addition, the application for stay is treated as a petition for writ of certiorari before judgment, and the petition is granted. The case is held in abeyance pending this Court's decision in *Merrill, AL Sec. of State, et al. v. Milligan, Evan, et al.* (No. 21-1086 and No. 21-1087) or further order of the Court. The stay shall terminate upon the sending down of the judgment of this Court. Justice Breyer, Justice Sotomayor, and Justice Kagan would deny the application for stay and dissent from the treatment of the application as a petition for writ of certiorari before judgment and the granting of certiorari before judgment.

*Ardoin v. Robinson*, No. 21-1596, 2022 WL 2312680, at *1 (U.S. June 28, 2022).

and (c) 1 month, and 1 week (or 38 days) before the Sept. 24 deadline for absentee ballots have to be mailed to military and overseas voters.  Thus, under the above precedent, this Court should not enjoin the upcoming School Board elections.

### 3. Significant Confusion, Costs, and Administrative Burdens

Additionally, even though Justice Kavanaugh outlined exceptions to this general rule, those exceptions do not apply here.  Most importantly, the Court finds that the changes in question are not feasible "before the election without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881.

The Secretary of State and Clerk of Court detail at length in their *Proposed Findings of Fact and Conclusions of Law* and *Reply* the considerable cost, confusion, and hardship that will be involved in changing the election this close to the deadlines. (*See SOS & COC's PFFCL* ¶¶ 44–63, Doc. 13; *see also SOS & COC's Joint Reply to Pls.' PFFCL* ¶¶ IV.B.4, 6–8, IV.E.1–7, IV.L.3, Doc. 17.)  The Court has reviewed each of these in detail and need not repeat them here.

Perhaps most convincing to the Court was the level of confusion which would take place if the current list of candidates is invalidated and if a new election is mandated based on reapportioned districts.  Specifically, Brandon Abadie, Deputy Clerk of Court for the Parish, attests that such a change by the Court would cause confusion because: (a) voters may wonder why candidates they previously believed were in one district are now identified with a different district; (b) voters will wonder why the number of candidates for their district has changed; (c) voters may think there is a mistake with their ballot; and (d) voters may think they are in the wrong precinct and ultimately may be inclined not to vote at all. (Abadie Decl. ¶¶ 44–46, COC Ex. 1.)  The Court

finds these concerns to be extremely significant, particularly considering the usual "pervasive" confusion that exists in any given election.[7]

Additionally, the Secretary also describes the confusion involved if the election were postponed or moved from November 8 to December 10. Such confusion includes:

(a) voters questioning why nominees to the School Board are not on the November 8 ballot despite their presence on sample ballots, (*see* Hadskey Decl. ¶¶ 35–36, SOS Ex. 3);

(b) voters potentially skipping the election in December because they believe they have already voted by mail in November, (*id.* ¶¶ 44(a));

(c) voters calling the Secretary and Clerk's office and asking why the December ballot (which is typically for general elections) has more than two candidates on it, (*id.* ¶ 44(b);

(d) perhaps most critically, voters asking why the names of candidates that were on their ballot on November 8, 2022, for a particular district are now on their December 10, 2022, ballot for a different district or not at all and submitting that there is a mistake that needs to be corrected, (*id.* ¶ 44(c);

(e) voters within households having confusion if one spouse votes on a mail-in ballot and another in person, (*see id.* ¶ 49).

---

[7] Abadie describes the usual confusion in any election as follows:

> Voter confusion is already pervasive in any election and can take on many forms, including voters who believed they would be able to vote for a certain candidate but could not (in which case they are referred to the ROV); voters who are not sure of their party affiliation (whom are also referred to the ROV); voters who are not sure of their polling location and require directions to the correct location; voters who are unsure how to work the voting machines (whom are instructed in their use by Commissioners); voters who require assistance to vote but do not have the proper paperwork authorizing it (in which case an affidavit is presented and completed on Election Day); and voters who, after standing in line at the wrong precinct, will become upset upon learning their mistake.

(Abadie Decl. ¶ 36, COC Ex. 1.)

These concerns strike the Court as real, legitimate, and substantial.  Further, as Hadskey attests, "It is this type of voter confusion that destroys voter faith in the integrity of the election process." (*Id.* ¶ 45.)

Additionally, the Secretary and Clerk emphasize the costs caused by delays, (*SOS & COC's Joint Reply to Pls.' PFFCL* ¶ IV.L 3), which are also detailed in Hadskey's declaration, (Hadskey Decl. ¶¶ 49, 51, SOS Ex. 3.)  Specifically, if the primary is moved to December 10, the state could lose the money it already spent in programing and printing ballots for early voting (i.e., for ballots, envelops, and instructions), in the amount of about $15,000. (*Id.*¶ 49.) Even worse, if a general election is called after a December 10, 2022, primary for the School Board, the cost for all 289 precincts for a January election (to be born completely by the Parish) are estimated to be approximately $400,000. (*Id.* ¶ 51.) The Court finds these costs to be very significant.

Finally, the Secretary and Clerk of Court highlight the considerable administrative burdens involved in changing the election this close. (*See SOS & COC's PFFCL* ¶¶ 50–65, Doc. 13.)  These are detailed in the declaration of Stephen Raborn, the Parish's Registrar of Voters. (*See* Raborn Decl. ¶¶ 11–27, SOS Ex. 4.)  In sum,

  (a) a new district plan would have to be designed and implemented, and voters would need to be correctly assigned to these districts, (*id.* ¶¶ 12–13);

  (b) voters would then need to be identified by district, and cards would need to be mailed to each voter any time the voter's polling place, precincts, or election district changes, (*id.* ¶ 15);

  (c) the Registrar of Voters would then need to assign voters in the computer registration system of their new voting districts in the Parish, (*id.* ¶ 20);

  (d) the Registrar would have to work with the Secretary and Moran Printing Company to review, proof, and test each form of ballot and each ballot style for each ballot to be used in the parish, (*id.* ¶ 21); and

(e) the Registrar would need to receive requests for absentee ballots and include the proper ballot with instructions and proper envelop for each voter, (*id.* ¶¶ 22–23).

All of this requires research, coordination between public bodies, and execution on an estimated time table to ensure approximately 17,609 absentee mail ballots are properly assembled, shipped, and entered into the system. (*See id.* ¶¶ 14, 18–21, 27; *see also* Hadskey Decl. ¶¶ 38, 48 (stating that there will be over 20,000 ballots that will be shipped out for voters over 65 years of age, for disabled voters, and for other voters requesting an absentee ballot).) Hadskey declared that, if a different apportionment plan is used, there is no guarantee that the steps necessary to ensure that the election takes place could be completed in time for the September 24, 2022, deadline for mail-in ballots. (Hadskey Decl. ¶¶ 47–48, SOS Ex. 3; *see also* Abadie Decl. ¶¶ 5–43, COC Ex. 1 (describing considerable efforts the Clerk of Court's Elections Department must engage in to ensure elections take place under normal circumstances).

The above burdens are more than a matter of "administrative convenience," as the Fifth Circuit found in *Robinson* (though, again, Judge Dick's injunction was ultimately stayed there). Rather, here, "[P]laintiffs have not established that the changes are feasible without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881–82.

### 4. The Court rejects Plaintiffs' limited arguments on these issues.

Plaintiffs respond on the issue of *Purcell*, but only in a limited way. In any event, the Court rejects these contentions.

Plaintiffs say that *Purcell* only governs injunctions issued days or weeks before the election under the Fifth Circuit's decision in *Robinson v. Ardoin*. But the Court has addressed this stance above and finds Plaintiffs' position to be without merit.

Plaintiffs' other argument is also meritless. Plaintiffs maintain that *Purcell* only applies to Voting Rights Act cases and not to constitutional challenges. But, just as *Pullman* abstention

applies in civil rights cases, *see Tex. Democratic Party*, 961 F.3d at 397 n.13, so too does the *Purcell* principle apply in civil rights cases, *see Andino v. Middleton*, 141 S. Ct. 9, 208 L. Ed. 2d 7 (2020) (staying preliminary injunction pending appeal in Fourth Circuit under *Purcell* principle in an action brought under the VRA *and* § 1983 alleging, *inter alia*, a violation of the Equal Protection clause); *Tex. Alliance for Retired Ams.*, 976 F.3d at 566 (granting stay in VRA case *and* § 1983 action alleging unconstitutionality of Texas law); *Walen v. Burgum*, No. 22-31, 2022 WL 1688746, at *6 (D.N.D. May 26, 2022) (denying preliminary injunction in part because of *Purcell* principle even though plaintiffs brought action under VRA *and* § 1983 for Equal Protection Clause violation).

### *5. Purcell in Closing*

It bears repeating:

> When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Merrill*, 142 S. Ct. at 880–81. "The [Supreme] Court has recognized that 'practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges.' So it is here." *Id.* at 882 (quoting *Riley v. Kennedy*, 553 U.S. 406, 426 (2008)). If Plaintiffs are ultimately entitled to an injunction, then that relief "can take effect for [School Board] elections that occur after 2022." *Id.* At present, however, Plaintiffs' *Motion* will denied under *Purcell*, and the 2022 School Board elections will be allowed to proceed.

### III.    Conclusion

Accordingly,

**IT IS ORDERED** that *Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction* (Doc. 4) filed by Plaintiffs, Adeline René Singleton, Christopher Kees, Sr., Tania Nyman, Dr. James C. Finney, Mary Anne "Boissiere" Lewis Leach, and Alvin Raetzsch is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>August 13, 2022</u>.


                    _____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**